# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **HARRIET P. HOLMES,** | ) | |
| | ) | **No. 16 CV 11264** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **NANCY A. BERRYHILL, Acting** | ) | |
| **Commissioner, Social Security** | ) | |
| **Administration,**[1] | ) | |
| | ) | **November 29, 2017** |
| **Defendant.** | ) | |

## MEMORANDUM OPINION and ORDER

Harriet Holmes filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") alleging that she is disabled by degenerative arthritis, bronchitis, difficulty walking after surgery on her toes, and problems breathing while walking. After the Commissioner of the Social Security Administration denied her applications, Holmes filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Holmes's motion is denied, and the government's is granted:

### Procedural History

Holmes filed her DIB and SSI applications on March 31, 2014, alleging a disability onset date of October 15, 2013. (Administrative Record ("A.R.") 15.) After her claims were denied initially and upon reconsideration, (id. at 87-120), Holmes

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is automatically substituted as the named defendant in this case.

sought and was granted a hearing before an Administrative Law Judge ("ALJ"), (id. at 31-84). The ALJ issued his decision on July 25, 2016, denying Holmes's applications. (Id. at 15-25.) When the Appeals Council denied Holmes's request for review, the ALJ's denial of benefits became the final decision of the Commissioner. *See Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). Holmes filed this suit seeking judicial review of the Commissioner's decision, (R. 1); *see* 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction, (R. 9); *see* 28 U.S.C. § 636(c).

## Background

At her May 2016 administrative hearing before the ALJ, Holmes, represented by counsel, submitted both documentary and testimonial evidence in support of her claims.

## A. Medical Evidence

The medical evidence of record shows that Holmes receives primary care treatment through the Midtown Medical Center where she is seen by Dr. Syed Husain. Holmes saw Dr. Husain once or twice a month between August 2014 and April 2016, primarily for management of her ongoing low-back and hip pain. (A.R. 403-63.)

On January 10, 2014, Holmes underwent x-rays of her lumbosacral spine, pelvis, and bilateral hips. (Id. at 343-44.) The lumbosacral x-rays revealed no acute fracture and only mild degenerative facet disease and mild degenerative disk disease. (Id. at 344.) The pelvic and hip x-rays indicated that the pelvic ring was intact, the sacroiliac joints were unremarkable, there was pseudo-articulation

between the right transverse process of L5 vertebra and the sacrum, and that there were calcifications in the right and left pelvis. (Id. at 343.) Views of the hips were unremarkable, demonstrating no acute fracture or dislocation and that the hip joints were preserved. (Id.)

On September 3, 2014, Holmes underwent an internal medicine consultative examination performed by Dr. Liana Palacci. (Id. at 356-59.) Holmes reported a past medical history of low-back pain since approximately November 2013. (Id. at 357.) She denied any history of trauma. (Id.) She indicated that she had x-rays of her back and was diagnosed with arthritis. (Id.) Holmes told Dr. Palacci that her pain radiated into the right buttock and leg, but she denied having numbness or weakness. (Id.) She stated that walking and standing exacerbated her pain and that sitting alleviated her discomfort. (Id.) Holmes also indicated that she had been using a non-prescribed cane for balance since February 2014 and that she needed the cane in order to walk more than 50 feet. (Id.)

Other than noting that Holmes had a mildly antalgic gait, Dr. Palacci reported that the physical examination was otherwise unremarkable. (Id. at 358.) She found that Holmes's grip strength was normal, that she could make fists and oppose fingers, that her range of motion of the shoulders, elbows, wrists, hips, knees, and ankles were normal, and that her reflexes were present, equal, and symmetric. (Id.) Her strength was 5/5 in the upper and lower extremities. (Id.) Holmes was able to heel-and-toe stand, perform knee squats, and walk 50 feet without the use of any assistive devices. (Id.) The range of motion of her cervical

and lumbar spine were normal and her straight leg raise test was negative. (Id.) The mental status examination was also normal. (Id.)

Following Holmes's consultative examination, non-examining agency consultant Dr. Charles Kenney reviewed her records and opined that Holmes retains the capacity to lift up to 20 pounds occasionally and up to 10 pounds frequently, and can sit, stand, or walk for approximately six hours in an eight-hour workday. (Id. at 99.) He further opined that Holmes could occasionally climb ramps, stairs, ladders, ropes, or scaffolds, balance, stoop, kneel, crouch, and crawl. (Id. at 99-100.)

On January 21, 2015, another non-examining agency consultant, Dr. Bernard Stevens, reviewed Holmes's records. Dr. Stevens noted that Holmes had not alleged worsening symptoms or limitations at the reconsideration level and affirmed Dr. Kenney's assessment of Holmes's exertional limitations. (Id. at 99, 106, 108.) However, Dr. Stevens assessed less restrictive postural limitations than Dr. Kenney. (Id. at 99-100, 109.) He opined that Holmes would be limited to occasionally climbing ladders, ropes, or scaffolds, and frequent climbing of ramps or stairs, stooping, kneeling, crouching, and crawling. Dr. Stevens found no limitations with regard to balancing. (Id. at 109.)

Meanwhile, Dr. Husain's 2014 and 2015 treatment records typically show Holmes reporting either low-back pain or hip pain made worse with ambulation and prolonged standing. (Id. at 403-41.) Musculoskeletal findings upon physical examination revealed either low-back tenderness or hip or bilateral hip tenderness.

(Id.) Overall, the notes reflect various diagnoses such as low-back pain, hip pain, joint stiffness, pain in the joint involving the lower leg, and pain in the joint involving the pelvic region and thigh. (Id.) In January 2015 Holmes began reporting myalgias and lower extremity pain and tightness, for which Dr. Husain prescribed Flexeril. (Id. at 412-15.) Then in June 2015, Holmes began reporting lower extremity neuropathic pain. (Id. at 423.) The records also reflect prescriptions for a walker and a shower bench for mobility assistance. (Id. at 418, 427.)

In May 2015 Holmes reported to Dr. Husain that she had been "feeling more depressed recently." (Id. at 421.) Dr. Husain noted that Holmes cried during the interview but that she had not followed up with a previous psychiatric referral. (Id.) Dr. Husain assessed depression and provided a new referral to a psychiatrist. (Id. at 421-22.)

On September 1, 2015, Dr. Husain completed a physical Medical Source Statement. (Id. at 366-71.) He noted diagnoses of degenerative arthritis, hip pain, and depression. (Id. at 366.) He indicated a satisfactory prognosis and reported that treatment had consisted of physical therapy and oral pain medication. (Id.) He noted, among other things, Holmes's bilateral hip pain, borderline diabetes mellitus, lower back tenderness, and bilateral hip tenderness. (Id.) Dr. Husain opined that Holmes's pain, symptoms, or medication side effects are frequently severe enough to interfere with her attention and concentration, and that she is incapable of tolerating even low-stress jobs. (Id. at 367.) He further opined that

Holmes's symptoms prevent her from maintaining the persistence and pace to engage in competitive employment. (Id.) He indicated that she is incapable of functioning on a part-time basis, and that her symptoms have a moderate impact on her ability to perform activities of daily living. (Id. at 368.)

According to Dr. Husain, in an eight-hour day Holmes could sit, stand, and walk less than two hours each. (Id. at 371.) He wrote that she would have to shift positions from sitting to standing or walking every 30 minutes, (id. at 370), but that she could sit continuously for 60 minutes, (id. at 369). Further, Holmes would need to elevate her legs or feet to 90 degrees. (Id. at 370.) According to Dr. Husain, if Holmes had a sedentary job her legs should be elevated 100% of the workday. (Id.) He also opined that Holmes requires the use of an assistive device and is unable to ambulate effectively unassisted to perform daily activities. (Id. at 367, 369.) She can occasionally lift 10 pounds, and can walk up to one block without rest or severe pain. (Id. at 369.)

Dr. Husain opined that physical activity, movement/overuse, temperature extremes, work stress, and static positioning would cause exacerbation of Holmes's symptoms. (Id. at 368.) He further opined that Holmes needed to lie down or recline throughout the day to alleviate her symptoms, and she would likely be absent four or more times per month because of her symptoms. (Id.) Additionally, Dr. Husain indicated that Holmes experiences fatigue that has a moderate impact on her ability to work and requires frequent, unscheduled rest breaks in addition to two standard breaks and a lunch break. (Id. at 369.) Holmes should never engage

in bending, twisting, stooping, climbing, kneeling, crouching, crawling, overhead work, frequent neck rotation, or walking up inclines; but she can occasionally reach, pull, push, engage in bilateral firm and fine grasping, and static neck flexion. (Id. at 370.) Finally, Dr. Husain opined that Holmes is capable of repetitive activities involving her arms, hands, and upper extremities, and has good use of both hands and fingers for bilateral manual dexterity, repetitive finger-hand actions, and manipulation of small objects with both hands. (Id. at 370-71.)

Upon returning to see Dr. Husain later in September 2015, Holmes reported numbness in the inguinal region. (Id. at 432.) Dr. Husain assessed neuropathy and referred her to a neurologist. (Id. at 433.) Holmes consulted with a neurologist in October 2015 for further evaluation of her complaints of numbness and tingling. (Id. at 399.) Although only the first page of the treatment note from that visit is available,[2] the record indicates that Holmes's medications at that time included Flexeril, Tylenol #3, and Elavil, an antidepressant. (Id.)

In October 2015 Holmes reported to Dr. Husain that she had seen a psychiatrist since her last visit and said she would be arranging a follow-up with a therapist. (Id. at 436.) The record includes a September 21, 2015 intake form and monthly Intensive Outpatient Program ("IOP") physician orders for group

---

[2] The court notes that the missing pages were addressed at the administrative hearing, but based on Holmes's testimony, it was determined that the full note would not contain any material information and therefore the ALJ chose not to keep the record open. Holmes's attorney did not object. (A.R. 36-39.)

psychotherapy at Norwegian American Hospital beginning in October 2015.[3]  (Id. at 375, 464-69.)  These orders reflect a diagnosis of depression and indicate that Holmes ambulates with an assistive device.  (Id.)  There is also evidence of monthly visits for depression at Norwegian American Hospital from October 13, 2015, through April 1, 2016, but the treatment notes from these visits were submitted after the ALJ issued his decision.  (See id. at 470.)

At a January 2016 visit with Dr. Husain, Holmes reported recent depression symptoms secondary to family issues.  (Id. at 442.)  She continued to report lower back pain and bilateral hip pain made worse with ambulation, along with lower extremity neuropathic pain.  (Id.)  A physical examination again revealed nothing more than bilateral hip tenderness, and Dr. Husain increased Holmes's Gabapentin prescription.  (Id. at 442-43.)  On March 25, 2016, Dr. Husain gave Holmes a referral for water aerobics classes.  (Id. at 453.)  Holmes continued to report back pain, hip pain, and lower extremity neuropathic pain through April 22, 2016, her last documented doctor's visit.  (Id. at 444-63.)

## B.  Holmes's Hearing Testimony

At her May 4, 2016 administrative hearing, Holmes described her past work history, symptoms, and daily routine.  She testified that she is unable to work because of back pain caused by arthritis, neuropathy in her right leg and right arm,

---

[3]  The IOP "is a 3-6 month program that provides intensive group therapy to clients with active symptoms of mental illness.  Treatment goals focus on avoiding psychiatric hospitalization or relapse, preventing deterioration of severe mood or psychotic symptoms, and maximizing level of independent functioning."  *See* Intensive Outpatient Program–Norwegian American Hospital, *available at* https://www.nahospital.org/intensive-outpatient-program/ (last visited Nov. 29, 2017).

bronchitis, and depression. (A.R. 42-43, 49-51.) Holmes discussed her past work as a case manager and stated that she would no longer be able to perform the physical demands of the job. (Id. at 42-44.)

Holmes estimated that she could walk approximately half a block without assistance, and lift up to 15 pounds. (Id. at 66.) She stated that sitting is painful for her, and some days she is unable to sit for more than an hour without having to get up and move around. (Id. at 70-71.) She does not go outside without her walker, and when she stands, she has to lean forward in order to ease the pain in her leg. (Id. at 66, 69.)

As for activities of daily living, Holmes testified that much of her time is spent sleeping and watching television. (Id. at 53.) Occasionally she goes downstairs to the social room in her building and watches television with other residents and plays bingo. (Id. at 52.) She no longer attends church because she has to rely on the church bus for transportation, and she is unable to get ready in time and cannot stay all day because of her conditions. (Id. at 71-72.) She goes to the store once or twice a month, but cannot carry her shopping bags, so she has to hook them onto her walker. (Id. at 49.) Holmes stated that she uses the Pace bus because she is unable to ride the train or take a regular bus. (Id. at 46-47.) She washes her dishes and makes her bed, but most other household cleaning chores go undone. (Id. at 68-69.) Most of her meals are prepared using a microwave oven. (Id. at 69.) She does laundry once a month and uses a cart to transport her clothing

to the laundry unit on the first floor. (Id. at 68.) Holmes testified that she is able to attend to her personal care needs. (Id. at 49.)

In terms of ongoing treatment, Holmes stated that she attends water aerobics once a week and participates in physical therapy. (Id. at 49, 66-67.) Regarding her depression, Holmes reported that she recently completed a six-month intensive outpatient therapy program at Norwegian American Hospital and was scheduled to begin a similar program at Mercy Hospital the following month. (Id. at 51-53.) Her current medications included Tylenol #3, diclofenac, Tramadol, Gabapentin, and Elavil. (Id. at 50-51, 73.)

## C. The ALJ's Decision

In applying the five-step sequence for assessing disability, *see* 20 C.F.R. § 404.1520(a)(4); *Stepp v. Colvin*, 795 F.3d 711, 716 (7th Cir. 2015), the ALJ found as an initial matter that Holmes met the insured status requirements through December 31, 2015, and has not engaged in substantial gainful activity since her alleged onset date, (A.R. 17). At step two the ALJ found that Holmes has the severe impairments of obesity, degenerative disc disease, and bilateral hip tenderness/arthritis. (Id.) The ALJ also noted Holmes's non-severe impairments of depression, asthma, elevated cholesterol, myopia, astigmatism, presbyopia, glaucoma suspect, and arcus senils. (Id. at 20-21.) At step three the ALJ found that Holmes does not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id. at 22.) The ALJ then found that Holmes has the

residual functional capacity ("RFC") to perform light work with the additional limitations of no more than frequent stooping, kneeling, crouching, crawling, or climbing ramps or stairs, and no more than occasional climbing of ladders, ropes, or scaffolds. (Id.) Based on this RFC, the ALJ determined at step four that Holmes is capable of performing her past relevant work as a case manager. (Id. at 25.) Accordingly, the ALJ concluded that Holmes is not disabled and denied her DIB and SSI applications. (Id.)

## D.    Post-Decision Evidence Submitted to the Appeals Council

In the months between the ALJ's and the Appeals Council's decisions, Holmes's attorney submitted additional medical records to the Appeals Council for review. These records included prescriptions dated March 9, 2015, from Dr. Husain for Tramadol, a shower bench, and a walker, and mental health treatment notes from Norwegian American Hospital, dated September 21, 2015, through April 29, 2016. (A.R. 474-565.) In denying Holmes's request for review, the Appeals Council wrote that it "considered" this additional evidence, but found that the information did not "provide a basis for changing the [ALJ's] decision." (Id. at 2.)

## Analysis

Holmes argues in her motion for summary judgment that the ALJ committed reversible errors by failing to accord controlling weight to the opinion of her treating physician and by incorrectly assessing her RFC. (R. 13, Pl.'s Mem. at 10-16.) Additionally, Holmes argues that remand is warranted based upon the Appeals

Council's failure to consider certain medical records as new and material evidence. (Id. at 2-10.)

The court's review of the ALJ's decision is "extremely limited," asking only whether the decision is free of legal error and supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stepp*, 795 F.3d at 718 (internal quotations and citations omitted). Because the court's role is neither to reweigh the evidence nor to substitute its own judgment for the ALJ's, if the ALJ's decision is adequately supported and explained it must be upheld even where "reasonable minds can differ over whether the applicant is disabled." *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). In order to adequately support the decision the ALJ must build "an accurate and logical bridge from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (internal quotation omitted).

## A.    The Appeals Council's Decision

The court first addresses Holmes's argument that the Appeals Council erred by declining review in light of new evidence, consisting of prescriptions from Dr. Husain dated March 9, 2015, and mental health treatment records from Norwegian American Hospital dated September 2015 through April 2016. (A.R. 475-565.) This court's ability to review the Appeals Council's decision "is dependent on the grounds on which the Council declined to grant plenary review." *See Stepp*, 795 F.3d at 722. Specifically, if the Appeals Council reviewed the

evidence and deemed it to be new and material but nevertheless concluded that the evidence does not demonstrate that the ALJ's decision was "contrary to the weight of the evidence," the Appeals Council's decision not to engage in plenary review is not subject to review. *See id.*; *Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997). If, on the other hand, the Appeals Council reviewed the evidence and concluded that it did not qualify under the regulation as being "new and material," the court may assess whether the Council committed a legal error in applying the relevant regulation. *See Stepp*, 795 F.3d at 722; *Farrell v. Astrue*, 692 F.3d 767, 771 (7th Cir. 2012).

In this case, the court must first determine whether the Appeals Council's order is more in line with the language of *Perkins*—and is not reviewable—or with *Farrell* and *Stepp*—and is subject to *de novo* review. As is often the case, here the Appeals Council used standard boilerplate language without expressly stating how it considered the additional evidence at issue, making the current case more akin to *Farrell* and *Stepp*. *See Stepp*, 795 F.3d at 723-24. The minimal information provided by the Appeals Council in its denial of Holmes's request for review does not allow the court to conclude that the Council accepted the prescriptions and mental health treatment notes as new and material evidence. *See id.* at 725. As the Seventh Circuit held in *Farrell*, the court therefore proceeds on the assumption that the Appeals Council found the additional evidence not new and material and turns next to determining whether that finding is erroneous. *See id.* (citation omitted).

Evidence is "new" within the meaning of the regulations if it was "not in existence or available to the claimant at the time of the administrative proceeding," and "material" if it "creates a reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered." *Id.* (quotations omitted). Moreover, "if new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the [ALJ] hearing decision." *See* 20 C.F.R. § 416.1470(b).

Holmes claims that the Appeals Council erred because the records submitted were both new and material. The court disagrees. Holmes states in her brief, "[t]here can be no serious dispute that the records submitted to the Appeals Council regarding Plaintiff's mental health treatment were 'new,' as they predate the ALJ's decision." (R. 13, Pl.'s Mem. at 6.) However, the fact that the records predate the ALJ's decision is precisely the reason why they are not "new." "New" is not construed under 20 C.F.R. §§ 404.970(b) and 416.1470(b) only to mean records that have been submitted for the first time to the Appeals Council. *See Williams v. Colvin*, No. 14 CV 5075, 2015 WL 5227736, at *9 (N.D. Ill. Sept. 4, 2015). As previously noted, evidence is new in this context only if it was "not in existence or available to the claimant at the time of the administrative proceeding." *See Stepp*, 795 F.3d at 725 (quotations omitted). Here, there can be no question that the mental health records were available prior to the May 4, 2016 administrative hearing as they are dated from September 2015 through April 2016. (A.R. 475-565.)

Further, Holmes does not allege that these records were unavailable to her, nor does she offer any explanation as to why they were not submitted to the ALJ for consideration at the hearing. *See* 42 U.S.C. § 405(g) (requiring a showing "that there is good cause for the failure to incorporate" the additional evidence into the record in a prior proceeding). Accordingly, Holmes has not shown that the Appeals Council erred in deeming the additional records to be non-qualifying under 20 C.F.R. §§ 404.970(b), 416.1470. *See Barth v. Colvin*, No. 13 CV 7788, 2015 WL 7180094, at *7 (N.D. Ill. Nov. 16, 2015).

## B.  Treating Physician's Opinions

Holmes next argues that the ALJ erred in denying controlling weight to the opinion of her primary care physician, Dr. Husain. (R. 13, Pl.'s Mem. at 10-15.) A treating physician's opinion receives controlling weight if it is "well-supported" and "not inconsistent with the other substantial evidence" in the record. *See* 20 C.F.R. § 404.1527(c)(2); *see also Punzio v. Astrue*, 630 F.3d at 704, 710 (7th Cir. 2011). An ALJ must offer "good reasons" for discounting the opinion of a treating physician. *See Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011). If an ALJ denies a treating physician's opinion controlling weight, he is still required to determine what value it merits. *See* 20 C.F.R. § 404.1527(c); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). In assigning that value the ALJ must "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the

physician's opinion."[4]  *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R. § 404.1527(c).

Here, the ALJ gave several supported reasons for ascribing only "minimal weight" to Dr. Husain's opinion.  First, he found that the opinion was at times internally inconsistent.  (A.R. 24.)  For example, the ALJ pointed out that despite reporting that Holmes is capable of only occasionally performing fine and gross manipulation, Dr. Husain also indicated that Holmes can perform repetitive activities of the bilateral hands, arms, and upper extremities.  (Id.)  The ALJ also noted that according to Dr. Husain, Holmes can sit for 60 continuous minutes at a time but apparently also needs to alternate positions every 30 minutes.  (See id.)  The ALJ was permitted to take these inconsistencies into account in assessing Dr. Husain's opinions.  *See Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000) (noting that internal inconsistencies may provide good cause to deny controlling weight to a treating physician's opinion so long as the ALJ provides an adequate explanation).

Next, the ALJ accurately found that Dr. Husain's opinion was "not supported by the evidence of record that includes x-rays showing unremarkable to only mild abnormalities, an internal medicine consultative examination showing essentially normal findings, and treatment notes with only vague and minimal findings." (A.R. 24.)  Similarly, the ALJ explained that he considered Dr. Husain's assignment

---

[4]  The SSA recently adopted new rules for agency review of disability claims involving the treating physician rule.  *See* 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844 (Jan. 18, 2017).  Because the new rules apply only to disability applications filed on or after March 27, 2017, they are not applicable in this case.  (Id.)

of "extreme" limitations to be inconsistent compared to the objective evidence of record and the doctor's "sparse exam findings." (Id.) The record supports these conclusions. The only abnormality noted on the consultative examiner's physical examination was a mildly antalgic gait, and Dr. Husain's physical examinations revealed nothing more than bilateral hip tenderness and low-back tenderness. Simply put, the ALJ found that the medical evidence pertaining to Holmes's physical condition was not consistent with Dr. Husain's RFC assessment, and the ALJ was entitled to rely on the inconsistencies between Dr. Husain's treatment notes and his opinions as a basis to discount those opinions. *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

Finally, the ALJ noted that the record lacked evidence of "any mental status exams (except from the [consultative examination]), mental health treatment, or antidepressant medications," and that Dr. Husain's exam notes showed "no findings or diagnosis of any mental health condition." (A.R. 24.) This rationale gives the court pause. Contrary to the ALJ's assertion, the record does contain at least some evidence of mental health treatment and a diagnosis of depression. For instance, Holmes reported to Dr. Husain in May 2015 that she had been "feeling more depressed recently." (Id. at 421.) Dr. Husain noted that Holmes cried during the interview and he assessed depression, referring her to a psychiatrist. (Id. at 421-22.) Then in September 2015, Dr. Husain assessed anxiety. (Id. at 434.) On October 13, 2015, Holmes reported having seen a psychiatrist and indicated that she would be arranging a follow-up with a therapist. (Id. at 436.) In January 2016

Holmes reported recent depression symptoms secondary to family issues. (Id. at 442.) Records from Norwegian American Hospital also reflect a diagnosis of depression and indicate that Holmes began taking antidepressant medication in October 2015. (Id. at 375, 399, 464-70.) There is also evidence of monthly visits for depression from October 13, 2015, through April 1, 2016, along with monthly IOP physician orders for group psychotherapy from that same time period. (Id.)

Significantly, however, the record is silent regarding limitations resulting from Holmes's depression. "It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citation omitted); 20 C.F.R. § 404.1512(c) ("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled."). Without such records, the ALJ reasonably concluded that the evidence did not show that Holmes's depression was a severe impairment that caused more than "minimal limitation in [her] ability to perform basic mental work activities." (A.R. 21); *see Shideler*, 688 at 310 (court's role is not to reweigh the evidence). Holmes's challenge to the ALJ's reliance on the lack of mental health treatment records as a basis for rejecting Dr. Husain's opinions rests entirely on the post-decision medical evidence submitted to the Appeals Council. But evidence that was not before the ALJ, and any argument based on such evidence, cannot support a court finding of reversible error. *See, e.g., Rice v. Barnhart*, 384 F.3d 363, 366 n.2 (7th Cir. 2004); *Slayton v. Colvin*, 629 Fed. Appx. 764, 771 (7th Cir. 2015) (stating that "medical records that

were not available to the ALJ cannot be used to determine the correctness of the ALJ's decision"); *Eads v. Sec'y of Dep't of Health & Human Servs.*, 983 F.2d 815, 818 (7th Cir. 1993) (noting that "courts may not reverse an [ALJ's] decision on the basis of evidence first submitted to the Appeals Council"). Moreover, as the court already determined, Holmes has failed to show that the Appeals Council erred in deeming these additional records to be non-qualifying. In sum, Holmes did not meet her burden of supplying evidence to the ALJ and she "cannot fault the ALJ for [her] own failure to support [her] claim of disability." *See Scheck*, 357 F.3d at 702.

Holmes also argues that the ALJ did not explicitly refer to the regulatory factors required under 20 C.F.R. § 404.1527(c) when he declined to afford Dr. Husain's opinion controlling weight. Under such circumstances, the relevant inquiry is "whether the ALJ sufficiently accounted for the factors in 20 C.F.R. § 404.1527 and built an 'accurate and logical bridge' between the evidence and his conclusion." *Schreiber v. Colvin*, 519 Fed. Appx. 951, 969 (7th Cir. 2013) (citations omitted). Here, the ALJ met this standard because his decision shows that he was aware of and considered many of those factors, and he logically connects the evidence in the record to his determination of the weight given to Dr. Husain's opinions.

First, the ALJ explicitly identified Dr. Husain as Holmes's primary care physician. (A.R. 17.) The ALJ's decision also describes the length, nature, and extent of Dr. Husain's treating relationship with Holmes, the frequency of Dr. Husain's examinations, and the types of tests performed. (Id. at 17-18.) The

ALJ noted that Holmes saw Dr. Husain approximately every two weeks to every month and a half, and also considered Dr. Husain's written opinion, which states that he is board certified in internal medicine and began treating Holmes in August 2013. (Id. at 17, 366.) The ALJ indicated that most of Holmes's visits with Dr. Husain were related to management of her low-back pain and hip pain, but acknowledged that Dr. Husain also treated Holmes for occasional acute conditions such as a cough or upper respiratory infection. (Id. at 17-18.) The ALJ further noted the objective medical testing, including a mammogram, colonoscopy, and January 2014 x-rays of the lumbosacral spine, hips, and pelvis. (Id. at 18, 343-44.)

The ALJ also considered the consistency of Dr. Husain's opinion with the record and the supportability of his opinion. As discussed above, Dr. Husain's opinion was inconsistent with diagnostic tests and physical examinations, as well as his own treatment notes. Thus, reading the ALJ's decision in its entirety, the court finds that the ALJ adequately engaged with the relevant factors in explaining his rejection of Dr. Husain's opinion.

In sum, the ALJ provided sound reasons, supported by substantial evidence, for declining to give Dr. Husain's opinion controlling weight. The ALJ's decision provides enough detail for the court to trace the logical bridge from his explanation to his conclusion. *See Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) (noting that a court properly reads ALJ decisions as a whole). Accordingly, Holmes has not shown that the ALJ committed reversible error in evaluating Dr. Husain's opinions.

## C. The RFC Determination

Finally, Holmes claims that "even if only *partial* credit is given to the opinion of Plaintiff's treating physician, the RFC is deficient as a matter of law because it fails to account for the limitations contained within this opinion, *numerous* of which are likely outcome-determinative." (R. 13, Pl.'s Mem. at 12) (emphasis in original). But developing the RFC is a fact-finding task assigned to the ALJ. *See* SSR 96-8p, 1996 WL 374184, at *2 n.4 (July 2, 1996). The Seventh Circuit has explained that "the determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide." *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014).

Moreover, an ALJ is required to include limitations in the RFC only if he finds them to be credible and supported by the medical evidence. *See Outlaw v. Astrue*, 412 Fed. Appx. 894, 898 (7th Cir. 2011). Because the court has already determined that the ALJ's reasons for discounting Dr. Husain's opinions are supported by substantial evidence, the ALJ was not required to include those limitations in his RFC determination. As such, Holmes has not demonstrated any error in the ALJ's RFC determination.

## Conclusion

For the foregoing reasons, Holmes's motion for summary judgment is denied, and the government's is granted.

**ENTER:**

**Young B. Kim**
**United States Magistrate Judge**